WO

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Barbara Sanchez, | No. CV-14-00199-PHX-JAT |
| Plaintiff, | **ORDER** |
| v. | |
| Carolyn W Colvin, | |
| Defendant. | |

Pending before the Court is Plaintiff Barbara Sanchez's appeal from the Social Security Commissioner (the "Commissioner")'s denial of her application for Social Security Disability Insurance Benefits. (Doc. 1). Plaintiff argues that the Administrative Law Judge ("ALJ") erred in assigning "little weight" to the medical opinion of Plaintiff's treating cardiologist, and by rejecting Plaintiff's testimony with respect to the symptoms afflicting her. (Doc. 32). The Court now rules on Plaintiff's appeal.[1]

## I.    Background

Plaintiff was born in 1974, and was thirty five years old on the date of her alleged

---

[1] Plaintiff requested oral argument for this motion. (Doc. 32 at 1). The Court will deny this request, as both parties have submitted memoranda discussing the law and facts in support of their positions and oral argument will not aide the Court's decisional process. *See e.g.*, *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998); *Lake at Las Vegas Investors Group*, *Inc. v. Pacific. Dev. Malibu Corp.*, 933 F.2d 724, 729 (9th Cir. 1991).

disability. (Tr. at 147).[2] Plaintiff holds a college education and has worked in the past as an advertising solicitor, sales representative, customer complaint clerk, customer service specialist, collection clerk, and insurance service representative. (Tr. at 49-50, 169). Plaintiff has a young son who was approximately a year-and-a-half old when Plaintiff allegedly became disabled. From the evidence before the Court, Plaintiff's last job appears to have been in advertising for a newspaper. Plaintiff was laid off in 2008 on account of the recession's significant impact on her line of work, and was thereafter unable to obtain employment through January of 2010. The ALJ determined that Plaintiff has not engaged in substantial gainful activity since that date.

On August 16, 2010, Plaintiff filed an application for Disability Insurance Benefits pursuant to Title II of the Social Security Act, due to the alleged disability of dilated non-ischemic cardiomyopathy with an onset date of roughly January 2010. The condition is, generally speaking, where there is dilation and impaired systolic function of the left or both ventricles of the heart. It impacts the heart's ability to pump blood. Plaintiff's impairment stemmed from a health incident in 2007 where "she came down with bronchitis and the virus attacked her heart." (Tr. at 24). Plaintiff developed cardiomyopathy as a result, and thereafter had a cardiac defibrillator/pacemaker installed. Plaintiff has alleged that this condition led to chest pains, fatigue, shortness of breath, and other symptoms that have rendered her incapable of returning to the workforce. (*Id.*).

Plaintiff's claim for benefits was initially denied on March 1, 2011, and again upon reconsideration on July 28, 2011. (Tr. at 20). Plaintiff thereafter filed a written request for a hearing on August 31, 2011, which was held before ALJ Ronald C. Dickinson on May 29, 2012. (*Id.*). After considering testimony delivered at the hearing and evidence entered into the record, the ALJ denied Plaintiff's claim for disability, finding that she was capable of performing sedentary work. Plaintiff appealed the ALJ's determination to the Social Security Administration Appeals Council, which denied a

---

[2] Citations to "Tr." are to the certified administrative transcript of record. (Doc. 22).

1   request review of the determination. (Tr. at 1-6).

2       On February 4, 2014, Plaintiff filed the instant action, seeking review of the ALJ's

3   determination. Plaintiff claims that the ALJ erred in two respects, and requests that the

4   Court overturn the ALJ's decision, and either award Plaintiff disability benefits, or

5   remand for further proceedings. With the appeal fully briefed, the Court turns to the

6   merits of Plaintiff's contention.

7

8                           **II.     Legal Standard**

9       The ALJ's decision to deny benefits will be overturned "only if it is not supported

10  by substantial evidence or is based on legal error." *Magallanes v. Bowen*, 881 F.2d 747,

11  750 (9th Cir. 1989) (quotation omitted). "Substantial evidence" means more than a mere

12  scintilla, but less than a preponderance. *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir.

13  1998).

14      "The inquiry here is whether the record, read as a whole, yields such evidence as

15  would allow a reasonable mind to accept the conclusions reached by the ALJ." *Gallant v.*

16  *Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984) (citation omitted). In determining whether

17  there is substantial evidence to support a decision, the Court considers the record as a

18  whole, weighing both the evidence that supports the ALJ's conclusions and the evidence

19  that detracts from the ALJ's conclusions. *Reddick*, 157 F.3d at 720. "Where evidence is

20  susceptible of more than one rational interpretation, it is the ALJ's conclusion which

21  must be upheld; and in reaching his findings, the ALJ is entitled to draw inferences

22  logically flowing from the evidence." *Gallant*, 753 F.2d at 1453 (citations omitted); *see*

23  *Batson v. Comm'r of the Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004). This is

24  because "[t]he trier of fact and not the reviewing court must resolve conflicts in the

25  evidence, and if the evidence can support either outcome, the court may not substitute its

26  judgment for that of the ALJ." *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992);

27  *see Young v. Sullivan*, 911 F.2d 180, 184 (9th Cir. 1990).

28      The ALJ is responsible for resolving conflicts in medical testimony, determining

credibility, and resolving ambiguities. *See Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). Thus, if on the whole record before the Court, substantial evidence supports the Commissioner's decision, the Court must affirm it. *See Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989); *see also* 42 U.S.C. § 405(g). On the other hand, the Court "may not affirm simply by isolating a specific quantum of supporting evidence." *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (quotation omitted).

Notably, the Court is not charged with reviewing the evidence and making its own judgment as to whether Plaintiff is or is not disabled. Rather, the Court's inquiry is constrained to the reasons asserted by the ALJ and the evidence relied upon in support of those reasons. *See Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003). On appeal, "issues which are not specifically and distinctly argued and raised in a party's opening brief are waived." *Arpin v. Santa Clara Valley Trans. Agency*, 261 F.3d 912, 919 (9th Cir. 2001) (citing *Barnett v. U.S. Air., Inc.*, 228 F.3d 1105, 1110 n.1 (9th Cir. 2000) (en banc)); *Bray v. Comm'r of Soc. Sec.*, 554 F.3d 1219, 1226 n.7 (9th Cir. 2009) (applying the principle to an appeal from a denial of benefits by the Social Security Commissioner). The Ninth Circuit's reasoning is that courts "will not manufacture arguments for an appellant, and a bare assertion does not preserve a claim." *Id.* (citation omitted).

## A.    Definition of Disability

To qualify for disability benefits under the Social Security Act, a claimant must show that, among other things, she is "under a disability." 42 U.S.C. § 423(a)(1)(E). The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

A person is "under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of

substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

## B.    The Five-Step Evaluation Process

To evaluate a claim of disability, the Social Security regulations set forth a five-step sequential process. 20 C.F.R. § 404.1520(a)(4); *see also Reddick*, 157 F.3d at 721. A finding of "not disabled" at any step in the sequential process will end the inquiry. 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof at the first four steps, but the burden shifts to the Commissioner at the final step. *Reddick*, 157 F.3d at 721. The five steps are as follows:

1. First, the ALJ determines whether the claimant is "doing substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If so, the claimant is not disabled.

2. If the claimant is not gainfully employed, the ALJ next determines whether the claimant has a "severe medically determinable physical or mental impairment." 20 C.F.R. § 404.1520(a)(4)(ii). To be considered severe, the impairment must "significantly limit[] [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). Basic work activities are the "abilities and aptitudes to do most jobs," such as lifting, carrying, reaching, understanding, carrying out and remembering simple instructions, responding appropriately to co-workers, and dealing with changes in routine. 20 C.F.R. § 404.1521(b). Further, the impairment must either have lasted for "a continuous period of at least twelve months," be expected to last for such a period, or be expected "to result in death." 20 C.F.R. § 404.1509 (incorporated by reference in 20 C.F.R. § 404.1520(a)(4)(ii)). The "step-two inquiry is a *de minimis* screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996). If the claimant does not have a severe impairment, then the claimant is not disabled.

3. Having found a severe impairment, the ALJ next determines whether the impairment "meets or equals" one of the impairments listed in the regulations. 20 C.F.R. § 404.1520(a)(4)(iii). If so, the claimant is found disabled without further inquiry. If not,

before proceeding to the next step, the ALJ will make a finding regarding the claimant's "residual functional capacity based on all the relevant medical and other evidence in [the] case record." 20 C.F.R. § 404.1520(e). A claimant's "residual functional capacity" ("RFC") is the most he can still do despite all his impairments, including those that are not severe, and any related symptoms. 20 C.F.R. § 404.1545(a)(1).

4. At step four, the ALJ determines whether, despite the impairments, the claimant can still perform "past relevant work." 20 C.F.R. § 404.1520(a)(4)(iv). To make this determination, the ALJ compares its "residual functional capacity assessment . . . with the physical and mental demands of [the claimant's] past relevant work." 20 C.F.R. § 404.1520(f). If the claimant can still perform the kind of work he previously did, the claimant is not disabled. Otherwise, the ALJ proceeds to the final step.

5. At the final step, the ALJ determines whether the claimant "can make an adjustment to other work" that exists in the national economy. 20 C.F.R. § 404.1520(a)(4)(v). In making this determination, the ALJ considers the claimant's "residual functional capacity" and his "age, education, and work experience." 20 C.F.R. § 404.1520(g)(1). If the claimant can perform other work, he is not disabled. If the claimant cannot perform other work, he will be found disabled.

In evaluating the claimant's disability under this five-step process, the ALJ must consider all evidence in the case record. *See* 20 C.F.R. § 404.1520(a)(3); 20 C.F.R. § 404.1520b. This includes medical opinions, records, self-reported symptoms, and third-party reporting. *See* 20 C.F.R. § 404.1527; 20 C.F.R. § 404.1529; SSR 06–3p, 71 Fed. Reg. 45593-03.

## C.   The ALJ's Evaluation Under the Five-Step Process

The ALJ found that Plaintiff had not engaged in substantial gainful activity since January 1, 2010, and that she was afflicted with the severe impairment of dilated non-ischemic cardiomyopathy, satisfying the first and second steps of the inquiry. (Tr. at 22). At step three, the ALJ found that Plaintiff's impairment did not meet or medically equal

1  any of the listed impairments in the Social Security regulations that automatically result

2  in a finding of disability. (*Id.* at 23).

3      Prior to moving on to step four, the ALJ conducted an RFC determination in light

4  of proffered testimony and objective medical evidence. (Tr. at 23-26). The ALJ

5  determined that Plaintiff "has the residual functional capacity to perform sedentary work"

6  while being "precluded from crawling, crouching, climbing, squatting, or kneeling." (*Id.*

7  at 23). Based on this RFC, the ALJ further determined that Plaintiff "is capable of

8  performing past relevant work as a customer complaint clerk, customer service specialist,

9  collection clerk and insurance customer service representative" as "[t]his work does not

10 require the performance of work-related activities precluded by the claimant's [RFC]."

11 (*Id.* at 27).

12     Consequently, the ALJ found that Plaintiff was not disabled under the Social

13 Security Act. (*Id.* at 28).

14

15                          **III.   Analysis**

16     Plaintiff advances two arguments in support of her contention that the Court

17 should set aside the ALJ's decision. Specifically, Plaintiff asserts that the ALJ erred in (1)

18 assigning "little weight" to the opinion of Plaintiff's treating cardiologist, and (2) by

19 finding that certain testimony Plaintiff delivered was not credible. Each will be addressed

20 in turn.

21

22 **A.    Rejection of the Treating Physician's Medical Opinion**

23     The Ninth Circuit distinguishes between the opinions of three types of physicians:

24 (1) those who treat the claimant ("treating physicians"); (2) those who examine but do not

25 treat the claimant ("examining physicians"); and (3) those who neither examine nor treat

26 the claimant ("non-examining physicians"). *Lester v. Chater*, 81 F.3d 821, 830–31 (9th

27 Cir. 1995). As a general rule, the opinion of an examining physician is entitled to greater

28 weight than the opinion of a non-examining physician, but less than a treating physician.

*Gallant*, 753 F.2d at 1454.

The opinion of a treating physician is entitled to controlling weight when it is "well supported by medically accepted clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the claimant's] case record." 20 C.F.R. § 404.1527 (d)(2); *see also Orn*, 495 F.3d at 631. But if a treating physician's opinion "is not well-supported" or "is inconsistent with other substantial evidence in the record," then it should not be given controlling weight." *Orn*, 495 F.3d at 631.

Substantial evidence that contradicts a treating physician's opinion may consist of either (1) an examining physician's opinion or (2) a non-examining physician's opinion combined with other evidence. *Lester*, 81 F.3d at 830-31.

In the case of an examining physician, "[w]hen an examining physician relies on the same clinical findings as a treating physician, but differs only in his or her conclusions, the conclusions of the examining physician are not substantial evidence." *Orn*, 495 F.3d at 632 (citing *Murray v. Heckler*, 722 F.2d 499, 501-02 (9th Cir. 1984)). To constitute substantial evidence, the examining physician must provide "independent clinical findings that differ from the findings of the treating physician." *Id.* (citing *Miller v. Heckler*, 770 F.2d 845, 849 (9th Cir. 1985)). Independent clinical findings can be either "diagnoses that differ from those offered by another physician and that are supported by substantial evidence . . . or findings based on objective medical tests that the treating physician has not herself considered." *Id.* (citing *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984)); *Andrews*, 53 F.3d at 1041. The opinion of a non-examining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician." *Lester*, 81 F.3d at 831. Such an opinion is only substantial evidence if supported by "substantial record evidence." *Id.*

If a treating physician's opinion is not contradicted by the opinion of another physician, then the ALJ may discount the treating physician's opinion only for "clear and convincing" reasons. *Carmickle*, 533 F.3d at 1164 (quoting *Lester*, 81 F.3d at 830). If the ALJ determines that a treating physician's opinion is inconsistent with substantial

evidence and is not to be given controlling weight, the opinion remains entitled to deference and should be weighed according to the factors provided in 20 C.F.R. § 404.1527(c). *Orn*, 495 F.3d at 631. These factors include (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the extent to which the opinion is supported by relevant medical evidence; (4) the opinion's consistency with the record as a whole; and (5) whether the physician is a specialist giving an opinion within his specialty. 20 C.F.R. § 404.1527(c). But the ALJ may still reject a contradicted treating physician's opinion for "specific and legitimate reasons that are supported by substantial evidence in the record." *Carmickle*, 533 F.3d at 1164 (quoting *Lester*, 81 F.3d at 830); *Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014) (quoting *Ryan v. Comm'r of Soc. Sec. Admin.*, 528 F.3d 1194, 1198 (9th Cir. 2008)).

Finally, "[a]lthough a treating physician's opinion is generally afforded the greatest weight in disability cases, it is not binding on an ALJ with respect to the existence of an impairment or the ultimate determination of disability." *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001). This is because the determination as to whether a claimant is disabled is an issue reserved to the Commissioner. 20 C.F.R. § 404.1527(d)(1). Thus, even if a treating physician's opinion is controlling, it does not necessarily lead to a finding of disability. *See Magallanes*, 881 F.2d 747, 753 (rejecting a treating physician's opinion of disability).

Dr. Renee Espinosa is Plaintiff's treating cardiologist. (Tr. at 26). In their respective briefs, the parties spend a considerable amount of effort arguing over which is the proper standard of review to hold the ALJ's consideration of Dr. Espinosa's medical opinion to. Plaintiff, on the one hand, argues that the record does not contain substantial evidence inconsistent with Dr. Espinosa's opinion, thus requiring the ALJ to proffer "clear and convincing" reasons in support of his decision to afford the opinion "little weight." (Doc. 32 at 16). The Commissioner, on the other hand, argues that the presence of a differing opinion by a non-examining physician coupled with other evidence of

1   record constitutes substantial evidence contradicting Dr. Espinosa's opinion, requiring

2   the ALJ to provide "specific and legitimate reasons" for discounting the at-issue medical

3   opinion.

4        To begin, the ALJ did not give "little weight" to Dr. Espinosa's opinion in light of

5   Dr. Terry Ostrowski's—a non-examining physician—differing opinion. Rather, the ALJ

6   determined that the objective medical evidence, including Dr. Espinosa's own records,

7   did not support Dr. Espinosa's opinion that claimant could not perform sedentary work.[3]

8   (Tr. at 27). An ALJ need not give "controlling weight" to a physician's opinion if that

9   opinion is "not well-supported" by the medical evidence. *Orn*, 495 F.3d at 631. Thus, the

10   ALJ provided a permissible reason for rejecting Dr. Espinosa's opinion, and, if that

11   reason is supported by substantial evidence, it must be upheld. *See Burkhart v. Bowen*,

12   856 F.2d 1335, 1339 (9th Cir. 1988) (affirming the ALJ's rejection of medical opinion

13   not supported by objective findings).

14        In this regard, Plaintiff asserts that the ALJ erred in his review of Dr. Espinosa's

15   opinion. (Doc. 32 at 16-22). Specifically, Plaintiff argues that the ALJ erred because his

16   rejection of Dr. Espinosa's opinion was based on a review of her "medical records," and

17   that pursuant to *Orn*, "[t]he primary function of medical records is to promote

18   communication and record-keeping" and "not to provide evidence for disability

19   determinations." 495 F.3d at 634. The Court disagrees. The ALJ did not rely solely on

20   Dr. Espinosa's "medical records" to discount her opinion. Rather, the ALJ explained that

21   her opinion was "not supported by the medical evidence, including the doctor's own

22   records." (Tr. at 27). And the ALJ did not reject outright the existence of Plaintiff's

23   _____

24        [3] The ALJ did cite to several other factors in support of his determination that Dr.
Espinosa's opinion should be afforded "little weight," but reading the ALJ's rationale in

25   context, these factors are best understood as specific examples of medical evidence that is

26   contrary to Dr. Espinosa's medical opinion. (Tr. at 27). For example, the ALJ's citation
to both Plaintiff's ability to run after her son and Dr. Espinosa's July 2011 opinion that

27   Plaintiff is stable from a cardiovascular perspective are both contained in the ALJ's
earlier, comprehensive determination that the objective medical evidence does not

28   support a determination that Plaintiff is disabled. (Tr. at 25).

condition, dilated non-ischemic cardiomyopathy. The ALJ determined that Plaintiff suffered from this impairment, but took exception to its *severity*, finding that the objective medical evidence did not support Dr. Espinosa's medical opinion that Plaintiff's impairment restricted her to less than sedentary work. (*Id.* at 26-27). The Ninth Circuit has recognized that "medical evidence is . . . a relevant factor in determining the severity of the claimant's pain and its disabling effects." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) (citing 20 C.F.R. § 404.1529(c)(2)). Therefore, the Court's review focuses on whether the ALJ's reliance on this factor is supported by substantial evidence.

Dr. Espinosa's medical opinion that Plaintiff is disabled is contained in two pieces of record evidence. On March 7, 2011, Dr. Espinosa concluded that Plaintiff's non-ischemic cardiomyopathy was a "lifelong disability" with "no anticipated recovery" that would "prevent" Plaintiff from "performing any substantial gainful employment for which [she] is qualified."[4] (Tr. at 492). On October 29, 2011, Dr. Espinosa completed a "Medical Assessment of Ability to Do Work Related Physical Activities" and "Cardiac Residual Functional Capacity Questionnaire." (Tr. at 519-523). In this assessment, Dr.

---

[4] The ALJ rejected Dr. Espinosa's opinions expressed in this assessment, noting that the statements used by Dr. Espinosa—such as "disabled, "unable to work," "can or cannot perform a past job" and "performing any substantial gainful employment"—were not medical opinions "but [we]re administrative findings dispositive of a case" and were reserved for the Commissioner to determine. (Tr. at 27). 20 C.F.R. § 404.1527(d)(2) establishes that although the Commissioner "consider[s] opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements" of being disabled, "the final responsibility for deciding these issues is reserved to the Commissioner." Dr. Espinosa, however, also set forth medical findings in an October 29, 2011, assessment that would render Plaintiff unable to work considering the testimony of the vocational expert in this case. The Court need not determine whether Dr. Espinosa's March 7, 2011, findings should be ignored as de facto administrative findings. The October 29, 2011, assessment would support a disability determination. And the Court's review is restricted to assessing whether the ALJ's determination that Dr. Espinosa's opinion as to Plaintiff's disability status (either the March, October, or both instances) was not supported by objective medical evidence is backed by substantial evidence of record.

Espinosa found that due to Plaintiff's impairment, she would be restricted to "occasionally" lifting ten pounds, and could only "frequently" lift or carry less than ten pounds. (*Id.* at 519). Plaintiff would be able to stand and/or walk for less than two hours in an eight hour work day and would be able to sit "less than" six hours out of each eight hour work day and would need to alternate between sitting and standing hourly. (*Id.* at 519-20). Based on these limitations, the vocational expert testified at the hearing that Plaintiff would be capable of "less than sedentary" employment. (Tr. at 53).

As noted *supra*, the ALJ gave "little weight" to Dr. Espinosa's opinions forming the basis of the vocational expert's testimony due to lack of support from objective medical evidence. Specifically, the ALJ supported this determination with citation to numerous pieces of evidence from the record. The Court finds that it in light of the volume of purported support cited to, it is appropriate to set forth the ALJ's rationale in full.

> Despite the deficits noted above (e.g. dilated cardiomyopathy and implantation of AICD in 2007), the medical record contains a considerable number of findings upon clinical examination that the undersigned finds inconsistent with a claim of an inability to perform any sustained work activity. Specifically, Dr. Espinosa the cardiologist reported in February 2010 that while the claimant was having some episodes of nausea, dizziness and low sterna discomfort, she had no syncope, palpations, and shortness of breath, fever, chills, or sweats (Exhibit 3F/35). The claimant's symptoms were of unclear etiology with the claimant's blood pressure remaining stable during these episodes (Exhibit 3F/36). Although the symptoms continued into March 2010, there was no dizziness, syncope, chest pain or shortness of breath (Exhibit 3F/33). In September 2010, she had an electrophysiology follow up at Arizona Arrhythmia Consultants. The claimant told the examining clinician that she continued to do well. She denied current episodes of chest pain, shortness of breath, lightheadedness, dizziness or frank syncopal episodes. Although she complained of significant fatigue, she reported that she had a 2 year old that she continued to "run after" (Exhibit 5F/5). The claimant was reported to be doing "exceedingly well" from a cardiac

rhythm and device standpoint.  She had had no arrhythmias (Exhibit 5F/6).  Also in September, a cardiac stress test was performed and ejection fraction of 39 percent was reported (Exhibit 4F/2-3). Cardiologist Kevin Berman, M.D. saw the claimant in June 2011. She had a second echocardiogram.  It was the doctor's impression that compared to her previous study in June 2010, the ejection fraction appeared to be somewhat better; previously it was 20-25 percent and as of June 2011, it was 30-35 percent (Exhibit 1l F/ 12). In July 2011, the claimant saw Dr. Espinosa and said she felt well even though she had some dyspnea with exertion.  She denied chest pain or discomfort, palpitations, shortness of breath, orthopnea, PND, intermittent leg claudication, irregular heartbeats, dizziness, syncope and edema (Exhibit 1l F/7). Her cardiac examination was within normal limits (Exhibit 1lF/8). Dr. Espinosa reported that as to the cardiomyopathy, the echocardiogram showed improved LVEF. The claimant was stable from a cardiovascular standpoint and she was specifically advised to exercise on a regular basis (Exhibit 1lF/8).  In October 2011, although the claimant complained of chest aching, weakness and fatigue, she denied palpitation s, shortness of breath, irregular heartbeats, dizziness, syncope and edema (Exhibit 16F/8).  The claimant's chest discomfort at that time was described as "atypical" and there was no evidence of inducible myocardial ischemia (Exhibit 16F/9). On October 28, 2011, Dr. Espinosa performed another echocardiogram. The claimant's ejection fraction was 30-35 percent (Exhibit 16F/7). In November 2011, the claimant complained of sporadic dizziness, leg weakness and back discomfort, but denied chest pain or discomfort, palpations, shortness of breath and related symptoms (Exhibit 16F/1). On physical examination, she was alert and in no acute distress and her heart rate and other cardiac functions were normal. There was no edema.  Again, her chest pain was described as atypical and her LV systolic function was slightly improved (Exhibit 16F/ l). Thus, the objective medical evidence does not demonstrate abnormalities that would interfere with the claimant's ability to perform the range of work identified above.

(Tr. at 25).

Moreover, the ALJ relied on evidence of multiple visits to the emergency room

that were "significant for their lack of objective findings and unremarkable examinations." (Tr. at 25-26). The record further establishes that Plaintiff's November 16, 2011, visit with Dr. Espinosa took place approximately two-and-a-half weeks after Dr. Espinosa completed her physical limitation assessment. At this visit, Plaintiff was found to be "alert and in no acute distress." (*Id.* at 542). Plaintiff was "advised to exercise as tolerated on a regular basis and to decrease her calorie intake by adopting" dietary changes. (*Id.* at 543). Plaintiff's "[c]hest discomfort" was "atypical in nature" but "persistent" and Plaintiff was instructed to "[c]ontinue medications at present" and return for a follow-up visit four months later. (*Id.* at 542). And as late as July of 2011, Dr. Espinosa found Plaintiff to be "stable from a cardiovascular standpoint" and advised to continue her current medication and exercise regularly as able. (*Id.* at 509-10).

Having reviewed the administrative record produced in this matter, the Court finds that the ALJ's rationale is supported by the record. And the reasons set forth by the ALJ constitute substantial evidence in support of his determination that Dr. Espinosa's medical opinion is not supported by objective medical evidence. Plaintiff argues in opposition that there is no indication from the records that Plaintiff was able to "tolerate a level of exercise at odds with her reported symptoms," (Doc. 32 at 19), and that Plaintiff's chest pains—described as atypical—is prevalent in approximately 25% of all patients diagnosed with dilated cardiomyopathy. Even accepting Plaintiff's objections, the Court finds that it is insufficient to establish that the ALJ committed error taking into account all of the medical evidence relied on by the ALJ. And the aforementioned evidence constitutes far more than "a mere scintilla." *Reddick*, 157 F.3d at 720.

As a result, the Court finds that there is substantial evidence in the record to support the ALJ's determination that Dr. Espinosa's opinion was not well-supported by objective medical evidence, and will be upheld.

**B.      Whether the ALJ Properly Discredited Plaintiff's Symptom Testimony**

Next, the Court addresses Plaintiff's argument that the ALJ erred by rejecting her

testimony with respect to the severity of the symptoms she suffered from. (Doc. 32 at 23).

### 1.    Legal Standard

An ALJ must engage in a two-step analysis to determine whether a claimant's testimony regarding subjective symptoms is credible. *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012). First, as a threshold matter, "the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991)). Second, if the claimant meets the first test, then "the ALJ 'may not discredit a claimant's testimony of pain and deny disability benefits solely because the degree of pain alleged by the claimant is not supported by objective medical evidence.'" *Orteza v. Shalala*, 50 F.3d 748, 749–750 (9th Cir. 1995) (quoting *Bunnell*, 947 F.2d at 346–47). Rather, "unless an ALJ makes a finding of malingering based on affirmative evidence thereof," the ALJ may only find the claimant not credible by making specific findings supported by the record that provide clear and convincing reasons to explain her credibility evaluation. *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006) (citing *Smolen*, 80 F.3d at 1283–84); *Lingenfelter*, 504 F.3d at 1036.

In rendering a credibility determination the ALJ may consider several factors, including "(1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities." *Tommasetti v. Astrue*. 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting *Smolen*, 80 F.3d at 1284). If the ALJ relies on these factors and her reliance is supported by substantial evidence, the Court "'may not engage in second-guessing.'" *Id.* (quoting *Thomas v. Bardnhart*, 278 F.3d 947, 958 (9th Cir. 2002)).

- 15 -

1    **2.    Analysis**

2         In this case, the Commissioner does not argue that the ALJ did not satisfy the

3    "threshold matter" of determining that Plaintiff presented evidence of an underlying

4    impairment that could produce the pain or the other symptoms alleged.[5] The Court's

5    review is thus confined to determining whether the ALJ provided "clear and convincing

6    reasons to explain h[is] credibility evaluation." *Robbins*, 466 F.3d at 883 (citation

7    omitted). Here, the ALJ rejected Plaintiff's subjective complaints because: (1) Plaintiff

8    received conservative treatment for her condition; (2) there had been no "significant

9    increase or changes in prescribed medication"; (3) Plaintiff stopped working for reasons

10   unrelated to her impairment; (4) the objective medical evidence did not support her

11   claims; and (5) Plaintiff's participation in daily activities was inconsistent with a

12   disabling impairment.

13

14        **a.    Evidence of Conservative Treatment**

15        Initially, the ALJ noted that Plaintiff's testimony was not entirely credible, in part,

16   because the record showed "conservative routine maintenance" of her physical affliction.

17   (Tr. at 24). The Ninth Circuit has noted a number of times that "evidence of 'conservative

18   treatment' is sufficient to discount a claimant's testimony regarding severity of an

19   impairment." *Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007) (quoting *Johnson v.*

20   *Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995)).

21        Plaintiff contends that the ALJ "provided his own medical opinion," which is

22   error. The Court is not persuaded. Here, the ALJ merely noted that the record contained

23   evidence of conservative treatment, which is a permissible factor to rely on. The ALJ

24   cited to the fact that nothing indicated that treatment through prescribed medication could

25   not adequately address Plaintiff's physical limitations. For example, evidence did not

26   _____

27        [5] The ALJ also stated in his determination that Plaintiff had presented medical

28   evidence of a "medically determinable impairment [that] could reasonably be expected to
     cause only some of the alleged symptoms." (Tr. at 24).

show that Plaintiff had to be hospitalized or that more aggressive treatment was necessary. Plaintiff's trips to the emergency room discovered nothing of note or concern regarding Plaintiff's impairment. And there was no indication that changes to or a "significant increase" in prescribed medication was necessary for treatment. Moreover, evidence shows that on June 20, 2011, Dr. Espinosa advised Plaintiff "to exercise as tolerated on a regular basis and to decrease her calorie intake" through dietary changes. (Tr. at 508). On November 17, 2011, Dr. Espinosa noted that Plaintiff should "[c]ontinue [her] medications as at present," and that she was "encouraged in [Plaintiff's] efforts regarding diet modification, exercise, [and] weight loss." (*Id.* at 542). Thus Dr. Espinosa again "advised" Plaintiff "to exercise as tolerated on a regular basis" and to make positive dietary adjustments. (*Id.* at 543).

Evidence of conservative medical treatment is a factor that the ALJ may properly consider in making a credibility finding with respect to a claimant's testimony. *Parra*, 481 F.3d at 751. In light of the above discussion, the Court finds that the ALJ's reliance on this factor is supported by substantial evidence in the record.

### b.      Lack of Change in Prescribed Medication

Next, the ALJ cited to the fact that "[t]here have been no significant increase or changes in prescribed medication reflective of an uncontrolled condition," and Plaintiff did not "describe side effects from her medication that would prevent her from substantial gainful activity." (Tr. at 24). While this factor is closely related to that of "conservative medical treatment," the Ninth Circuit has noted that "[i]mpairments that can be controlled effectively with medication are not disabling for the purposes of determining eligibility for [Social Security] benefits." *Warre v. Comm'r of the SSA*, 439 F.3d 1001, 1006 (9th Cir. 2006). Therefore, while the effectiveness of previously prescribed medication may be indicative of "conservative medical treatment," analysis as a separate factor is appropriate.

Plaintiff has been treated by Dr. Espinosa for a number of years, as a February 18,

2008, "Cardiology Consultation" with Dr. Espinosa notes that Plaintiff was "known" to her from her "prior practice." (Tr. at 332). Follow-up visits with Dr. Espinosa indicate that there were adjustments or alterations made to Plaintiff's prescribed medicine to treat various physical ailments she described. (Tr. at 335-61).

By 2011, Plaintiff had been treated by Dr. Espinosa for, at a minimum, three years. Following a January 11, 2011, visit, Dr. Espinosa noted that Plaintiff would return to see her at usual intervals," and that she "appear[ed] to be stable, from an electrophysiology standpoint." (Tr. at 585-86). Plaintiff was instructed to replace Gatorade with water, to monitor her fluid levels, and that she should contact Dr. Espinosa if Plaintiff continued to feel swollen with thickened ankles and shortness of breath even with the implemented sodium restriction. (*Id.*). Dr. Espinosa saw Plaintiff again on May 23, 2011, and reviewed her medications and left them "unchanged" while letting Plaintiff know that "she could take an extra dose of Lasix and potassium" (Tr. at 583). Plaintiff had complained of "some palpitations and shortness of breath" and "weight gain." (*Id.*). Following a July 6, 2011, visit, Dr. Espinosa ordered Plaintiff to continue her current medications. (Tr. 509-10). Plaintiff denied "chest pain or discomfort, palpitations, shortness of breath" and irregular heartbeats. (*Id.*). Plaintiff also claimed to "feel[] well per her norm" although Plaintiff " felt more dyspnea with exertion during outside activities" due to summer heat. (*Id.*).

Plaintiff again met with Dr. Espinosa on October 19, 2011, and complained of being "weak and fatigued" and was suffering from some chest "aching" and sporadic headaches. Plaintiff denied suffering from "irregular heartbeats, dizziness" shortness of breath or palpitations. (Tr. at 548-49). Dr. Espinosa noted that Plaintiff "continues to attempt to obtain disability for her cardiomyopathy," and advised Plaintiff to continue taking her current medications. Dr. Espinosa also warned Plaintiff that she was to "seek immediate medical attention" if she experienced concerning changes or "worsening symptoms." (*Id.*). Finally, following Plaintiff's November 16, 2011, visit with Dr. Espinosa, Plaintiff complained of feeling "not well," and suffering from sporadic

dizziness, back discomfort, leg weakness, and claimed to have episodes of what she described as her body "shaking inside." (Tr. at 541-43). Plaintiff denied suffering from "chest pain or discomfort, palpitations, shortness of breath" or irregular heartbeat, and was again directed to continue taking her prescribed medications without change or alteration, and to continue exercising as able.

The aforementioned record evidence is sufficient to constitute substantial evidence supporting the ALJ's reliance on this particular factor. A reasonable interpretation of the evidence shows that over time, Dr. Espinosa was able to craft a package of medications to treat Plaintiff's symptoms, and this treatment plan remained stable over a period of almost a year with no demonstrative worsening of Plaintiff's symptoms. While Plaintiff complained of certain symptoms each time she met with Dr. Espinosa, the record lacks evidence to establish that there was a tangible change in Plaintiff's status. The ALJ's interpretation is thus entitled to deference, and the Court may not substitute its view for that of the ALJ. *See Samuels v. Colvin*, No. CV-12-01665-PHX-JAT, 2014 U.S. Dist. LEXIS 37389, at *12-13 (D. Ariz. March 21, 2014), *aff'd*, 2016 U.S. App. LEXIS 14055 (9th Cir. Aug. 2, 2016) (finding that the ALJ did not in relying upon evidence "that showed medications and treatment were relatively effective").

### c.      Plaintiff's Inability to Obtain Employment

Additionally, the ALJ found that "evidence suggest[ed] that the claimant stopped working for reasons not related to the allegedly disabling impairments" she suffered from, "which raises a question as to whether the claimant's continuing unemployment is actually due to medical impairments." (Tr. at 24). The Ninth Circuit has recognized that the ALJ may properly consider whether a claimant's lack of employment is due to reasons other than a disabling medical condition. *See Bruton v. Massanari*, 268 F.3d 824, 828 (9th Cir. 2001), *as amended* (Nov. 9, 2001) (finding that an ALJ properly discredited a claimant's testimony because he "stated at the administrative hearing and to at least one of his doctors that he left his job because he was laid off, rather than because he was

injured").[6]

At the May 29, 2012, hearing held before the ALJ, Plaintiff testified that she was "laid off" from her most recent position of employment in December of 2008. (Tr. at 42). Plaintiff's position was in advertising, and in light of the recent recession's effect on the market, there was a severe decline in the industry, and Plaintiff's company "let go quite a few of us" and that the advertising department was one of the first to be hit. (*Id.*). After Plaintiff was laid off, she looked for work until January of 2010, but could not find any positions because she "was either over qualified, or there just nothing available in my field that [she] had studied." (*Id.*). In January of 2010, however, Plaintiff "came to the realization that [she] wasn't going to be able to hold a full-time job anymore." (*Id.*). Plaintiff had continued to "just work and work," but then "got to the point where it was too exhausting for [her] to even look for work," but that she "nonetheless tried to keep working." (*Id.* at 43).

There is nothing in the record to suggest that there was a demonstrative change in Plaintiff's condition on or about January of 2010. Plaintiff relies on her own testimony in which she claimed that at this time she "started getting a lot more chest pains and just becam[e] a lot more fatigued" and "wasn't functioning throughout the day as [she] had been before." (Tr. at 42). But in July, October, and November 2011 visit with Dr. Espinosa, Plaintiff denied suffering from chest pains. Having reviewed the record, the Court finds that Plaintiff's testimony is susceptible to more than one rational interpretation. In such a case, the ALJ "is entitled to draw inferences logically flowing from the evidence." *Gallant*, 753 F.2d at 1453 (citations omitted). Here, as the ALJ's reliance on this factor is supported by substantial evidence and from "inferences

---

[6] Such evidence may, in fact, be "affirmative evidence" of "malingering." *See Berry v. Astrue*, 622 F.3d 1228, 1235 (9th Cir. 2010) (holding that ALJ properly found "affirmative evidence of malingering" because the claimant "reported that he wanted to do volunteer work but refrained for fear of impacting his disability benefits, and claimed disability dating from his last day of employment even though he admitted at the hearing that he left his job because his employer went out of business and probably would have worked longer had his employer continued to operate").

1   reasonably drawn from the record," the Court "must uphold the ALJ's findings." *Molina*,

2   674 F.3d at 1111 (citing *Tommasetti*, 533 F.3d at 1038); *Rollins*, 261 F.3d at 857).

3

4              **d.      Objective Medical Evidence**

5          The Ninth Circuit has consistently held that "[c]ontradiction with the medical

6   record is a sufficient basis for rejecting the claimant's subjective testimony." *Carmickle*

7   *v. Comm'r*, *SSA*, 533 F.3d 1155, 1161 (9th Cir. 2008) (citing *Johnson v. Shalala*, 60 F.3d

8   1428, 1434 (9th Cir. 1995)). Here, the ALJ went into great detail citing evidence from

9   Plaintiff's medical visits and the evidence generated from them. Given the Court's

10  previous discussion of objective medical evidence in contradiction to the disabling nature

11  of Plaintiff's impairment, the Court need not again set forth in full the specific evidence

12  relied upon. It is sufficient to note that the ALJ relied on medical evidence that was

13  generated from each of Plaintiff's clinical examinations from February 2010 through

14  November 2011. (Tr. at 25).

15         Included in the medical evidence relied on was that in September 2010, Plaintiff

16  "was reported to be doing 'exceedingly well' from a cardiac rhythm and device

17  standpoint." (Tr. at 26). In July 2011, Plaintiff "was stable from a cardiovascular

18  standpoint and . . . was specifically advised to exercise on a regular basis." (*Id.*) And in

19  November 2011, "her chest pain was described as atypical" and she "denied chest pain or

20  discomfort, [heart] palpitations, shortness of breath and related symptoms." (*Id.*). The

21  ALJ further cited to the "records of emergency room visits during the period of

22  adjudication" and found that "their lack of objective findings and unremarkable

23  examinations" to be "significant." (*Id.*). The ALJ again went into substantial detail in

24  describing the medical evidence that resulted from Plaintiff's emergency room visits. (*Id.*

25  at 26). In sum, the ALJ cited to numerous pieces of medical evidence in support of his

26  negative credibility finding, each of which was supported by substantial evidence.

27         Having reviewed the record, the Court finds that the ALJ's reliance on

28  contradicting medical evidence is supported by substantial evidence, and may not be set

1   aside.

2

3                    **e.      Engagement in Daily Activities**

4          Finally, the ALJ cited to Plaintiff's ability to "run after her two-year-old child" as

5   evidence that "paints a different picture" than that of a disabled individual. (Tr. at 26

6   (internal quotation marks omitted). The Ninth Circuit has long held it appropriate to

7   consider a claimant's engagement in daily activities as a factor in assessing witness

8   credibility. *See Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). While a claimant need

9   not "vegetate in a dark room" in order to be eligible for benefits, *Cooper v. Bowen*, 815

10  F.2d 557, 561 (9th Cir. 1987) (quotation omitted), "the ALJ may discredit a claimant's

11  testimony when the claimant reports participation in everyday activities indicating

12  capacities that are transferable to a work setting." *Molina*, 674 F.3d at 1113 (citing

13  *Morgan v. Commissioner of the SSA.*, 169 F.3d 595, 600 (9th Cir. 1999)). Moreover, even

14  if the daily activities undertaken by the claimant "suggest some difficulty functioning,

15  they may be grounds for discrediting the claimant's testimony to the extent that they

16  contradict claims of a totally debilitating impairment." *Id.* (citing *Turner v. Comm'r of

17  Soc. Sec.*, 613 F.3d 1217, 1225 (9th Cir. 2010)).

18         On September 14, 2010, medical notes from Dr. Espinosa indicate that Plaintiff

19  "continues to do well," and that while "[s]he does have significant fatigue," Plaintiff also

20  "has a [two]-year-old, who she continues to run after." (Tr. at 408). On January 4, 2011,

21  notes from Dr. Espinosa state that Plaintiff "continually has to run after" her two-year-old

22  son, and that "her energy level is very important to her." (*Id.* at 584). The Ninth Circuit

23  has made clear that attending to the "needs" of one's children is a daily activity that the

24  ALJ may rely upon in discrediting the testimony of a claimant. *Rollins*, 261 F.3d at 857.

25  But in *Rollins*, the Ninth Circuit noted that the claimant "attended to 'all of her children's

26  needs" which included "meals, bathing, emotional discipline," as well as making "daily"

27  trips outside the house to "her son's school, taekwondo lessons and soccer games,

28  doctor's appointments, and the grocery store." 261 F.3d at 857. Thus, the claimant's

ability to undertake such a range of activities undermined her own testimony of experiencing disabling symptoms.

Here, the only daily activities the ALJ cited to were two brief portions of the record in which Dr. Espinosa indicated that Plaintiff could—or had to—run after her young child. The Court does not mean to suggest that by the ALJ's only citing to Plaintiff's "running," Plaintiff did not, or could not, undertake the litany of daily activities the claimant in *Rollins* did through daily care of her children. But in the instant action, the ALJ's determination relies solely on her "running," with no context as to whether she could, the effect on her daily schedule, and whether Plaintiff undertook any other daily activities associated with child care. Thus, based on the record before it, the Court cannot conclude that solely by focusing on "running" after her two-year-old, Plaintiff has "report[ed] participation in everyday activities indicating capacities that are transferable to a work setting." *Molina*, 674 F.3d at 1113 (citation omitted).

### 3.   Conclusion

Based on the foregoing, the ALJ's negative credibility finding was a reasonable interpretation of the evidence. The ALJ relied on the factors of Plaintiff's conservative medical treatment, the circumstances surrounding Plaintiff's lack of employment, the adequacy of previously prescribed medicine, and contradicting medical evidence, each of which is permissible in the Ninth Circuit. Each of the aforementioned factors is supported by substantial evidence of record. The ALJ thus set forth specific, clear, and convincing reasons to explain his credibility evaluation, and, consequently, "it is not [the Court's] role to second-guess it."[7] *Rollins*, 261 F.3d at 857 (citing *Fair*, 885 F.2d at 604).

---

[7] Reliance on the "daily activities" undertaken by Plaintiff, by itself and under these circumstances, would be insufficient to support the ALJ's negative credibility determination. As discussed previously, however, the ALJ relied on a handful of other permissible factors supported by substantial evidence. The Court's finding with respect to the "daily activities" factor does not affect the Court's conclusion that the ALJ set forth specific, clear, and convincing reasons in support of his credibility determination.

1

2

3                          **IV.    Conclusion**

4         For the reasons stated above,

5         **IT IS ORDERED** that the Commissioner's decision denying benefits, (Doc. 1), is

6   **AFFIRMED**, and Plaintiff's appeal is hereby **DENIED**. The Clerk of Court shall enter

7   judgment accordingly and terminate this case.

8         Dated this 30th day of September, 2016.

9

10

11

12                                        James A. Teilborg
                                    Senior United States District Judge
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28